IN THE MATTER OF THE APPLICATION OF LANCE-LOT JULIAN HYLTON, Petitioner, *v.* THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, DEPT. IV and THE HONORABLE EARLE W. WHITE, Judge of the Eighth Judicial District Court, Respondents.

No. 17301

September 30, 1987                    743 P.2d 622

*James O. Porter,* Las Vegas, for Petitioner.

*Rex Bell,* District Attorney, *James Tufteland,* Deputy District Attorney, Clark County, for Respondents.

## OPINION

*Per Curiam:*

This petition for writ of prohibition asks this court to prohibit further prosecution of petitioner Hylton on the ground that to try him again would violate his right not to be twice put in jeopardy for the same offense. U.S. Const. amend. V; Nev. Const. art. 1, § 8.

### Facts

In 1981, Lancelot Julian Hylton was charged with robbery, murder, and use of a deadly weapon in the commission of an offense. The first trial, in 1982, resulted in a conviction which was reversed on appeal due to prosecutorial misconduct. Hylton v. State, 100 Nev. 539, 688 P.2d 304 (1984). The matter was remanded for a new trial. *Hylton,* 100 Nev. at 541, 688 P.2d at 305. A defense counsel was appointed to represent Hylton.

At two separate appearances, approximately seven months prior to the second trial, the defense counsel informed the district court and the district attorney's office that one and one-half years earlier he had had a professional contact with one Paul Chambers, who was a possible prosecution witness at trial. The defense counsel had contacted Chambers in jail regarding the possibility

of representing Chambers and had discussed the very criminal transaction from which the charges against Hylton arose. The defense counsel talked with the prosecutor; the prosecutor indicated that the state might call Chambers as a witness. The defense counsel pointed out to the district court and a deputy district attorney that Chambers might assert his attorney-client privilege if he were called as a witness at trial.

The district court instructed the assigned deputy district attorney that the district attorney's office was to "give us some better indication of whether or not they are going to use Mr. Chambers because the objection may not be forthcoming from anyone but Mr. Chambers himself if he had a discussion with [the defense counsel] wherein he was attempting to establish an attorney-client relationship." The deputy assented to the district court's instructions. Later, the state listed Paul Chambers as a prospective witness in an amended information and certified the state's efforts to compel Chamber's attendance to testify.

Trial was set for November 4, 1985. On October 30, 1985, the defense counsel filed a motion to continue. In an affidavit, the defense counsel reiterated to the district court that he had had a previous contact with Chambers and stated that it was not known to him if Chambers would be a witness. The defense counsel also stated that Hylton had an expectation of inheriting some money and had expressed a desire to retain his own lawyer. The prosecutor opposed the motion to continue. The prosecutor acknowledged that Chambers was a "potential witness" and stated that the defense counsel's relationship with Chambers posed no problem for the state. The motion to continue was denied.

At calendar call the prosecutor did not mention Chambers or express his intention to call him; he merely commented that he was proceeding to compel a certain witness to attend the trial. Apparently this alerted the defense attorney to the possibility that Chambers might be called, so he checked the record and found indeed that proceedings were afoot for the state to compel Chambers' appearance as a witness for the state.

During argument on the motion to grant the mistrial, the prosecutor pointed out that Chambers, a percipient witness to the homicide, was expected to testify in favor of the defendant, Hylton. The purpose behind the state's calling Chambers was its intention to impeach its own witness by confronting Chambers with a prior inconsistent statement said to have been made by Chambers.

At no time prior to trial did the prosecutor's office advise defense counsel that it planned to call Chambers, and defense counsel was not aware until calendar call of the state's intention to call Chambers. Appellate counsel for the state excuses this failure to notify defense counsel on the ground that the trial

prosecutor "didn't perceive the problem in that [sixth amendment] context"; and further, that if the trial prosecutor "had recognized the problem there is no doubt that he would have done something about it." The state's appellate counsel blames the whole fiasco on a "communication breakdown" within the district attorney's office.

The end result of the communication breakdown was that defense counsel was confronted with a prosecution witness who was a former client with whom he had discussed the very matter being tried.

The problem came to a head when Chambers was called as a witness by the state. Chambers first claimed the privilege against self-incrimination. This privilege was denied by the trial court on the ground that Chambers was no longer in jeopardy in the matter at hand.

At this juncture, defense counsel called the court's attention to the difficulties inherent in cross-examining his former client, Chambers. The prosecutor then moved for a mistrial, stating that Chambers was a "primary" witness whose inability to testify would be prejudicial to the state's case.

Without canvassing Chambers to determine the nature of his testimony or whether Chambers asserted the attorney-client privilege, the trial court declared a mistrial. Defense counsel then moved to dismiss the information on the ground that a subsequent prosecution would put Hylton twice in jeopardy. The motion was denied; and, thereafter, Hylton filed this petition for prohibition to prohibit further prosecution.

### Relief Sought

A writ of prohibition arrests the proceedings of any tribunal exercising judicial functions, when such proceedings are without or in excess of the jurisdiction of such tribunal. NRS 34.340. Hylton claims that the district court does not have jurisdiction to order a new trial because a new trial would violate his constitutional right against double jeopardy.

A state may not put a defendant in jeopardy twice for the same offense.[1] U.S. Const. amend. V; Nev. Const. art. 1, § 8. The double jeopardy clause of the fifth amendment directly applies to states under the due process clause of the fourteenth amendment. Benton v. Maryland, 395 U.S. 784 (1969).

As a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial. Arizona v. Washington, 434 U.S. 497, 505 (1978). Retrial is not automatically barred when a criminal proceeding is terminated without

---

[1]Jeopardy attaches when a jury has been selected and sworn. Downum v. United States, 372 U.S. 734 (1963); Wheeler v. District Court, 82 Nev. 225, 415 P.2d 63 (1966). Jeopardy attached at Hylton's second trial.

finally resolving the merits of the charges against the accused. *Id.* Because of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, the defendant's valued right to have the trial concluded by a particular tribunal is sometimes subordinated to the public interest in affording the prosecutor one full and fair opportunity to present the state's evidence to an impartial jury. *Id.;* Illinois v. Somerville, 410 U.S. 458, 470 (1973); Downum v. United States, 372 U.S. 734, 736 (1963) (defendant's right subordinated to the public interest "when there is imperious necessity to do so"); Wade v. Hunter, 336 U.S. 684, 688-89 (1949) (defendant's right may be subordinated to the "public's interest in fair trials designed to end in just judgments").

The prosecutor has a heavy burden of justifying the mistrial in order to avoid the double jeopardy bar. *Washington,* 434 U.S. at 505. The reviewing court must decide whether the declaration of a mistrial was dictated by "manifest necessity" or the "ends of public justice."[2] *Somerville,* 410 U.S. at 463; *see* Carter v. State, 102 Nev. 164, 717 P.2d 1111 (1986); Wheeler v. District Court, 82 Nev. 225, 229, 415 P.2d 63, 65 (1966) (double jeopardy protects defendant when the jury is discharged before the verdict, unless defendant consents or some overruling necessity operates as an acquittal). There are degrees of necessity; the United States Supreme Court requires a "high degree" before concluding that a mistrial is appropriate. *Washington,* 434 U.S. at 506; *Carter,* 102 Nev. at 169, 717 P.2d at 1114.

The United States Supreme Court has consistently refused to pronounce general rules delineating when the manifest necessity standard has been met; each case must turn on its facts. *Downum,* 372 U.S. at 737; *see Somerville,* 410 U.S. at 462-64.

In analyzing the facts of this case to determine if double jeopardy bars further prosecution, this court must make a two-part inquiry. We must first decide whether declaration of the mistrial was dictated by manifest necessity or the ends of justice

---

[2]We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, *there is manifest necessity for the act, or the ends of public justice would otherwise be defeated.* They are to exercise sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes.

(Emphasis added.) United States v. Perez, 22 U.S. (9 Wheat.) 579, 580 (1824).

and, second, in the presence of manifest necessity, whether the prosecutor is responsible for the circumstances which necessitated declaration of a mistrial.

## Manifest Necessity for New Trial

On the question of whether a mistrial was manifestly necessary or dictated by the ends of justice, we note first that Hylton made no objections nor complaints that his counsel was going to be so impaired in his examination of Chambers that Hylton would be denied a fair trial. As in the case of Chambers, the trial court did not choose to canvass defendant Hylton before granting the mistrial to the state. It is highly probable that Hylton, if asked, would have had no objections to Chambers's testifying because of the likelihood that Chambers would have testified in his favor.

Chambers never asserted any claim of attorney-client privilege, and the trial court's granting of a new trial must, of necessity, have been based on the judge's assumption that Chambers was going to claim the privilege. Chambers may have waived the privilege and consented to defense counsel's examining him concerning the facts surrounding the accusation against Hylton. Until the trial judge knew whether or not the privilege was going to be asserted, he could not make a fully informed decision on the necessity of declaring a mistrial.

Like the trial judge, we cannot safely tell if a mistrial was necessary and cannot properly conclude, therefore, that a mistrial was a "manifest necessity."

Circumstances constituting a manifest necessity to declare a mistrial should appear in the record. State v. Eisentrager, 76 Nev. 437, 357 P.2d 306 (1960). In *Eisentrager*, the trial court discharged the jury because it was unable to come to a conclusion. While the record did not reflect the jury foreman's statement that the members of the jury were unable to agree upon a verdict, the remarks of the judge in discharging the jury included his reference to the fact that the jury had been unable to come to a conclusion. This court reversed the district court's order dismissing the information on grounds of double jeopardy.

The essential fact that Chambers invoked his attorney-client privilege is not in the trial transcript in this case. Chambers did not in fact personally invoke his privilege, rather the court presumed that Chambers would do so.

Manifest necessity to declare a mistrial may also arise in situations in which there is an interference with "the administration of honest, fair, even-handed justice to either, both, or any of the parties to the proceeding." People v. Clark, 705 P.2d 1017, 1019 (Colo.Ct.App. 1985). When the absence of a witness would effectively prevent the state from presenting its case, there can

arise a manifest necessity for a mistrial. State v. Connery, 100 Nev. 256, 258, 679 P.2d 1266, 1268 (1984).

In *Clark,* both state and defense counsel referred in their opening statement to fingerprint evidence; a mistrial was declared when the key fingerprint evidence was ruled inadmissible. The *Clark* court found manifest necessity since the jury had been given information during the course of the trial that they subsequently would not hear as evidence. In the instant case, both the prosecutor and defense counsel had referred in their opening statements to certain evidence which would be admissible by virtue of the testimony of Chambers.

The mere fact, however, that counsel mentions evidence during opening statement which is later discovered to be inadmissible, does not mean that it is manifestly necessary to abort the prosecution and start over. *Enright v. Siedleck,* 451 N.E.2d 176, 181 (N.Y.Ct.App. 1983). A witness who admittedly will testify in favor of the defendant is of dubious rather than manifest value to the prosecution. Again, there is an absence of information in the record. Had the court carefully inquired into the substance of Chambers' testimony and the inconsistent statement, it would have been in a much better position to make a judgment on the necessity for Chambers's testimony (or rather the necessity to permit the prosecution to play the game of calling him and then contradicting him).

We are forced to conclude that if there were a real necessity to declare a mistrial in this case, the necessity is certainly not "manifest" from the record before us.

### Prosecutorial Responsibility for Mistrial

Our holding that a mistrial was not manifestly necessary in this case makes it unnecessary to make the second inquiry as to whether the prosecutor was "in some way responsible" for the circumstances which gave rise to any possible necessity to declare a mistrial. We do address this question, nevertheless, and conclude that the prosecutor was responsible and that even had it been manifestly necessary to declare a mistrial, we should have to grant the writ on grounds of the prosecutor's role in bringing about any need for mistrial.

Prior to trial, the prosecutor had been given adequate warning that Chambers might invoke his right to the attorney-client privilege upon cross-examination by the defense counsel, thereby threatening the integrity of the trial. Even though the state claims that the defense counsel never elaborated upon the extent of his relationship with Chambers, the defense counsel did inform the

state that he discussed the facts of the pertinent criminal event with Chambers in a contact with Chambers designed to determine whether he would represent Chambers. Such information, even in the abstract, should have put the prosecution on notice that a risk existed that Chambers would invoke his attorney-client privilege upon cross-examination.

Significantly, in light of the defense counsel's conflict of interest, the district court requested the district attorney's office to forewarn the court of their intent to call Chambers as a witness. At the calendar call, the defense counsel asked for a continuance based upon his conflict of interest and upon Hylton's desire to retain new counsel at his own expense; the prosecution opposed that motion to continue, although he knew that the state was actively attempting to compel Chambers as a witness at that time.

The prosecutor is in many ways responsible, for the declaration of a mistrial at Hylton's second trial. The prosecutor was put on notice of the potential for a mistrial and yet failed to support the defendant's motion for a continuance which would have led to the appointment of new counsel and would have avoided the potential for a mistrial.

Prosecutorial responsibility for the declaration of a mistrial does not always preclude a new trial. *See Somerville, supra* (defective indictment); Wright v. State, 101 Nev. 269, 701 P.2d 743 (1985) (failure to include the count of aiding and abetting in an information); *Enright,* 451 N.E.2d at 181 (evidence referred to in opening remarks later discovered to be inadmissible; prosecutor's motion for mistrial granted and affirmed on appeal if prosecutor did not act in bad faith).

A factually analogous case is Melchor-Gloria v. State, 99 Nev. 174, 660 P.2d 109 (1983). In *Melchor-Gloria,* a tape-recorded interrogation of the defendant was inadmissible because a second translation revealed incomplete Miranda rights had been given. In preparing for his opening statement, the prosecutor did not review the portion of the transcript which contained the Miranda warnings. Prior to trial, both counsel met in chambers to discuss the deficiencies in the Miranda warnings. The defense counsel came away from that meeting with the understanding that an agreement had been reached to the effect that the issue of the admissibility of the defendant's statements would be dealt with in an appropriate hearing. In his opening statement, the prosecutor referred to the potentially inadmissible statements. The defense counsel objected, but the prosecution successfully argued to overrule the objection. The defendant's statements were subsequently suppressed, and on defense motion, a mistrial without prejudice to the prosecution was declared.

In *Melchor-Gloria,* we did not find prosecutorial overreaching or harassment intended to goad a defendant into moving for a

mistrial which would preclude a new trial. The *Melchor-Gloria* prosecutor did not act intentionally or with bad faith, and the prosecutor was not "grossly" negligent. We concluded that the prosecutor had been negligent but that "the relatively unusual factual setting of the instant case partially mitigates the prosecutor's derelictions."

The issue before this court is whether the prosecutor's decision to proceed to trial was "excusable" negligence or "inexcusable" negligence. The prosecutor was warned as early as seven months prior to trial on three different occasions[3] that Chambers could invoke an attorney-client privilege if the defense counsel represented Hylton at trial. As of the calendar call, the prosecutor had made efforts to compel Chamber's attendance at trial and yet he opposed the defense counsel's motion to continue in order that Hylton could obtain new counsel.

We conclude that the prosecutor committed "inexcusable" negligence. The prosecutor did not prevent the circumstances for a mistrial from occurring, when the prosecutor had adequate notice that a mistrial was likely to occur and when the prosecutor's office was expressly asked by the court to be forthcoming on that issue. Although the prosecutor was subjectively unaware of the substantive ramifications of calling a witness who could invoke an attorney-client privilege on cross-examination, we cannot accept such an error of judgment as "excusable" when weighed against the defendant's constitutional right to be free from repeated attempts to convict him of the alleged offenses.

### Hylton's Responsibility for Mistrial

The state claims that "the defendant engaged in a course of conduct calculated to necessitate the granting of a mistrial." An important factor to be considered is the need to hold litigants on both sides to standards of responsible professional conduct in the clash of an adversary criminal process. United States v. Jorn, 400 U.S. 470, 485-86 (1971).

A defendant who actively engages in a course of conduct calculated to necessitate the granting of a mistrial, but who does not actually request a mistrial, is similarly barred from relying on a double jeopardy defense at a second trial. *McNeal,* 481 P.2d at 1151. If the act of a defendant aborts a trial, he or she should not be allowed to erect a constitutional shelter based on double jeopardy by frustrating the trial. People v. Paquette, 292 N.E.2d

---

[3]The defense counsel brought this issue to the attention of the court and the state on March 11, March 18, and October 30.

17 (N.Y. 1972). Defendant should not benefit from difficulties of his own creation. *Id.*

The record does not support a finding that the defense counsel engaged in a course of conduct calculated to necessitate a mistrial.

Hylton's constitutional right not to be put in jeopardy twice precludes further prosecution against him of the alleged offenses. We hereby order that an appropriate writ of prohibition be issued.