ANDREW J. BECK, Petitioner, *v.* THE SEVENTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, in and For The County of Eureka, and THE HONORABLE DAN L. PAPEZ, District Judge, Respondents, and THE STATE OF NEVADA, Real Party in Interest.

No. 29433

May 22, 1997                    939 P.2d 1059

*Steven G. McGuire,* State Public Defender and *Sue Fahami,* Deputy Public Defender, Carson City, for Petitioner.

*William E. Schaeffer,* District Attorney, Eureka County, for Respondents and Real Party in Interest.

## OPINION

By the Court, MAUPIN, J.:

On September 2, 1995, Devanie Allen spent part of the day at Petroglyph State Park, along with her two children and her friend, Kristi Despain. At about 5:50 p.m., the foursome left the park and began driving east on Highway 50, with Allen driving. A car passed them, and according to Allen, the driver smiled at her. The driver of the other car was petitioner Andrew Beck. After Beck got ahead of Allen's group, he pulled off the highway and stopped. Allen alleges that she saw Beck get out of his car and remove his pants. Allen testified that Beck then started walking toward the trunk of his car, holding up his shirt to expose himself. After Allen and her group passed Beck, he got back into his car and came up behind Allen's car, following her. Allen used her cellular phone to call the police. A sheriff's deputy responded and stopped Beck.

Beck's version of the story differs.[1] Approximately four months before the incident in question, Beck had a vasectomy. Because of the surgery, he is uncomfortable sitting for long periods of time. As he was driving, he took off his shorts in an attempt to get more comfortable, and he laid his shorts on his lap. After Beck passed Allen's car, his trunk came unlatched and so he pulled over to the side of the road. In his haste to close his trunk, Beck jumped out of the car and the shorts fell to the ground, exposing Beck to Allen, Despain, and the children. Beck, embarrassed, got back into his car and resumed his journey. The fact that he caught up to Allen's car was merely coincidental.

On September 29, 1995, an information was filed, charging

---

[1]The trial was stopped before the state finished presenting its case. The following account is taken from the opening statement of Beck's counsel.

Beck with indecent exposure. A jury trial commenced on November 8, 1995. Allen testified without incident. The state called Despain as a witness. Despain's mother, Peggy Jardine, was sitting in the audience observing. During the defense's cross-examination of Despain, the defense attorney stated: "Your Honor, I have an objection. The mother is mouthing words and nodding her head to the witness. That's certainly improper." Whereupon the following exchange took place:

> THE COURT: Is that going on? Are you talking to—are you the mother?
> FROM THE AUDIENCE: Yes, I am.
> THE COURT: Are you mouthing words to the witness?
> FROM THE AUDIENCE: I wasn't mouthing any words. I was just—what I'm saying—how can she understand? I wasn't mouthing anything.
> THE COURT: I'll direct you leave the courtroom at this time.
> FROM THE AUDIENCE: Okay.

After Jardine left the courtroom, cross-examination of Despain continued without incident, and the state conducted redirect.

The following morning, when the trial resumed, the district judge expressed concern about "certain alleged improprieties that may have occurred during the testimony yesterday of one of the State's witnesses, Kristie [sic] Despain." The district court decided to conduct a hearing outside the presence of the jury.

Susan Harrison, a prospective juror who had been excused but who had remained to observe the trial, testified. Harrison related that she had observed Despain mouthing words toward the audience during a sidebar. Despain also testified, and she indicated that she did not mouth words to her mother during her testimony, that she did not even make eye contact with her mother during her testimony, and that she had not discussed the incident with her mother since it originally happened. Jardine was called to testify, but she invoked her Fifth Amendment rights and refused to testify.

After the hearing, the district judge said, "Counsel, in my mind this trial at this point has been infected with a virus. I don't think it is curable by anything that we can do." The judge went on:

> The court sua sponte is going to make a finding that there is a manifest necessity to declare a mistrial in this case based upon all of the factors that I've stated in the matter. And, I truly believe that the ends of justice in this case require that a mistrial be declared.

Both the defense and the state objected to the declaration of a mistrial.

Beck now seeks a writ of prohibition, claiming that if the state attempts to re-try him, he will be placed in double jeopardy, in violation of the constitutions of the United States and Nevada. U.S. Const. amend. V; Nev. Const. art. 1, § 8.

> In analyzing the facts of this case to determine if double jeopardy bars further prosecution, this court must make a two-part inquiry. We must first decide whether declaration of the mistrial was dictated by manifest necessity or the ends of justice and, second, in the presence of manifest necessity, whether the prosecutor is responsible for the circumstances which necessitated declaration of a mistrial.

Hylton v. District Court, 103 Nev. 418, 422-23, 743 P.2d 622, 625 (1987).

This court has previously held that "[d]enial of a motion for mistrial is within the trial court's sound discretion. The court's determination will not be disturbed on appeal in the absence of a clear showing of abuse." Owens v. State, 96 Nev. 880, 883, 620 P.2d 1236, 1238 (1980). In this case, we conclude that the district court did not abuse its discretion, because the district judge's questioning of Jardine *and the implication that there was* improper communication between Jardine and Despain created a situation where declaration of a mistrial became a manifest necessity. Specifically, we note that Despain was one of only two witnesses to the incident, so her testimony was very important to the state's case. Additionally, credibility was very important, since it was essentially Beck's word against Despain's and Allen's. Because credibility was such an important issue, the exchange which occurred between Jardine and the district judge was particularly prejudicial, and would have severely impacted the jury's ability to reach an impartial verdict. "A trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached . . . ." Illinois v. Somerville, 410 U.S. 458, 464 (1973).

We therefore conclude that the district court's declaration of a mistrial over the objection of the defendant and the state was dictated by manifest necessity. Further, it is clear that the prosecution was not responsible for the circumstances which caused the district court to declare a mistrial. The district court specifically found "that the State, the prosecution, is in no way, shape or form at fault for what has happened in this case." This finding is supported by the record. Accordingly, we conclude that the requirements of *Hylton* are satisfied and Beck may be retried *without implicating the Double Jeopardy Clause. The petition is* denied.

SHEARING, C. J., and YOUNG, J., concur.

SPRINGER, J., with whom ROSE, J., agrees, dissenting:

The majority correctly notes that the decision to declare a mistrial is within the discretion of the district court, citing Owens v. State, 86 Nev. 880, 620 P.2d 1236 (1980). That discretion is not unlimited, however. Where, as here, there is a possible implication of the double jeopardy clause because a mistrial was declared over the objection of the defendant, this court has scrutinized the district court's decision more closely than the majority's analysis would suggest. E.g., Hylton v. District Court, 103 Nev. 418, 743 P.2d 622 (1987); Carter v. State, 102 Nev. 164, 717 P.2d 1111 (1986); State v. Helm, 66 Nev. 286, 209 P.2d 187 (1949). In such a case, "[t]he prosecutor has a heavy burden of justifying the mistrial in order to avoid the double jeopardy bar." Hylton, 103 Nev. at 422, 743 P.2d at 625.

"A trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial." Illinois v. Somerville, 410 U.S. 458, 464 (1973). The question before this court, then, is whether events at trial would have necessarily meant a reversal on appeal, had petitioner been convicted.

I note that the district judge, by asking Jardine if she was mouthing words to Despain, did not comment on the credibility of Despain, but on the actions of a spectator. Further, the incident was very brief and would not appear to have made much of an impression on the jurors. In fact, after Jardine was asked to leave the courtroom, cross-examination of Despain continued and the state conducted redirect examination. It was not until the following morning that the district court declared a mistrial.

In my view, the district judge acted properly by simply excluding Jardine from the courtroom; and the exchange which occurred between the district judge and Jardine would not have mandated a reversal on appeal. If the district court felt that further action was necessary to cure any perceived tainting of Despain's credibility, an admonition to the jury would surely have been sufficient. I cannot conclude, therefore, that declaration of a mistrial was a "manifest necessity." I conclude that the case against appellant should be barred by the prohibition against double jeopardy and the petition should be granted.